UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

JESSICA MARIE NICHOLS

CIVIL ACTION

VERSUS

NO. 16-77-SDD-EWD

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF
SOCIAL SECURITY

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the U. S. District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 14 days after being served with the attached report to file written objections to the proposed findings of fact, conclusions of law, and recommendations set forth therein. Failure to file written objections to the proposed findings, conclusions and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in Baton Rouge, Louisiana, on July 11, 2017.

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

JESSICA MARIE NICHOLS

CIVIL ACTION

VERSUS

NO. 16-77-SDD-EWD

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF
SOCIAL SECURITY

## MAGISTRATE JUDGE'S REPORT

Plaintiff, Jessica Marie Nichols ("Plaintiff"), brought this action under 42 U.S.C. § 405(g) for judicial review of the final decision of Carolyn W. Colvin, Acting Commissioner of Social Security (the "Commissioner") denying her applications for disability insurance benefits.[1] Plaintiff has filed an Opening Brief,[2] the Commissioner has filed a Memorandum in Opposition,[3] and Plaintiff has filed a Reply.[4]  Based on the applicable standard of review under § 405(g) and the analysis which follows, the undersigned recommends that the Commissioner's decision be AFFIRMED.

### I.    Procedural History

Plaintiff filed applications for disability insurance benefits and childhood disability

---

[1] *See*, AR pp. 18-30.  References to documents filed in this case are designated by "(R. Doc. [docket entry number(s)] p. [page number(s)]."  References to the record of administrative proceedings filed in this case are designated by "(AR [page number(s)]."

[2] R. Doc. 9.

[3] R. Doc. 11.

[4] R. Doc. 12.

benefits on June 28, 2013[5] alleging disability beginning June 1, 2010.[6]  Plaintiff's claim was initially denied on October 14, 2013,[7] and thereafter Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").[8]  A hearing was held on June 16, 2014 at which Plaintiff, represented by counsel, and Plaintiff's grandmother, testified.[9]  A vocational expert, Beverly K. Majors, also appeared and testified.[10]

On October 31, 2014, the ALJ issued a notice of unfavorable decision.[11]  Thereafter, Plaintiff requested review by the Appeals Council.[12]  On January 13, 2016, the Appeals Council denied Plaintiff's request for review.[13]  On February 4, 2016, Plaintiff filed her Complaint.[14] Accordingly, Plaintiff exhausted her administrative remedies before timely filing this action for judicial review and the ALJ's decision is the Commissioner's final decision for purposes of judicial review.[15]

---

[5] AR pp. 153-160.  Pursuant to 20 C.F.R. § 404.350(a), a claimant is "entitled to child's benefits on the earnings record of an insured person…who has died if…(5) …you are 18 years old or older and have a disability that began before you became 22 years old….".  As set forth below, Plaintiff's date last insured was December 31, 2011 and she turned 22 on November 2, 2013.  For purposes of disability insurance benefits, Plaintiff therefore must establish disability during the time period of June 1, 2010 through December 31, 2011.  For purposes of child's benefits, Plaintiff must establish disability during the time period of June 1, 2010 through November 2, 2013.

[6] AR p. 153.

[7] AR pp. 82-89.

[8] AR pp. 90-91.

[9] AR pp. 35-61.

[10] AR pp. 56-60.

[11] AR pp. 15-30.

[12] AR p. 14.

[13] AR pp. 1-3.

[14] R. Doc. 1.

[15] *See*, 20 C.F.R. § 404.981 ("The Appeals Council may deny a party's request for review or it may decide to review a case and make a decision.  The Appeals Council's decision, or the decision of the administrative law judge if the request for review is denied, is binding unless you or another party file an action in Federal district court, or the decision is revised.  You may file an action in a Federal district court within 60 days after the date you receive notice of the Appeals Council's action.").

## II.    Standard of Review

Under 42 U.S.C. § 405(g), judicial review of a final decision of the Commissioner denying disability benefits is limited to two inquiries: (1) whether substantial evidence exists in the record as a whole to support the Commissioner's findings, and (2) whether the Commissioner's final decision applies the proper legal standards. *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). If the Commissioner fails to apply the correct legal standards, or provide a reviewing court with a sufficient basis to determine that the correct legal principles were followed, it is grounds for reversal. *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981); *Western v. Harris*, 633 F.2d 1204, 1206 (5th Cir. 1981); *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982).

## III.    The ALJ's Decision

A claimant has the burden of proving that he or she suffers from a disability, which is defined as a medically determinable physical or mental impairment lasting at least 12 months that prevents the claimant from engaging in substantial gainful activity. 20 C.F.R. §§ 404.1505; 416.905. The regulations require the ALJ to apply a five-step sequential evaluation to each claim for benefits. 20 C.F.R. §§ 404.1520; 416.920. In the five-step sequence used to evaluate claims the Commissioner must determine whether: (1) the claimant is currently engaged in substantial gainful activity; (2) the claimant has a severe impairment(s); (3) the impairment(s) meets or equals the severity of a listed impairment in Appendix 1 of the regulations; (4) the impairment(s) prevents the claimant from performing past relevant work; and, (5) the impairment(s) prevents the claimant from doing any other work. *Masterson v. Barnhart*, 309 F.3d 267, 271 (5th Cir. 2002).

The burden rests upon the claimant throughout the first four steps of this five-step process to prove disability. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). If the claimant is

successful at all four of the preceding steps then the burden shifts to the Commissioner to prove, considering the claimant's residual functional capacity ("RFC"), age, education and past work experience, that he or she is capable of performing other work.  20 C.F.R § 404.1520(g)(1).  If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove that he or she cannot, in fact, perform that work.  *Muse*, 925 F.2d at 789.

Here, the ALJ made the following determinations:[16]

1. Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2011;

2. Plaintiff was born on November 3, 1991 and had not attained age 22 as of June 1, 2010, the alleged onset date;[17]

3. Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of June 1, 2010 through her date last insured of December 31, 2011;

4. Prior to attaining age 22, Plaintiff had the following severe impairments: post-traumatic stress disorder, bipolar disorder, and attention deficit hyperactivity disorder;

5. Through the date last insured, Plaintiff had the following severe impairments: post-traumatic stress disorder, bipolar disorder, and attention deficit hyperactivity disorder;

6. Prior to attaining age 22, Plaintiff did not have an impairment or combination of impairments that met or medially equaled the severity of the listed impairments;

7. Through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medially equaled the severity of one of the listed impairments;

8. Prior to attaining age 22, and through the date last insured, Plaintiff had the residual functional capacity ("RFC") "to perform a full range of work at all exertional levels but with the following non-exertional limitations: unskilled work with no strict time limits or

---

[16] AR pp. 20-30.

[17] The same five step sequential evaluation process applies to determine eligibility pursuant to this section.  *See*, *Stringer v. Astrue*, 465 Fed. Appx. 361, 362-363 (5th Cir. 2012) (setting out five step analysis to determine child's benefits pursuant to 20 C.F.R. § 404.350(a)(5).  *See also*, *Smith v. Colvin*, Civil Action No. 15-5135, 2017 WL 744572, at *7 (E.D. La. Feb. 3, 2017) ("A child of an individual who dies a fully or currently insured individual under the Act is eligible for social security insurance benefits if the child is under a disability that began before he attained the age of 22. 42 U.S.C. § 402(d)(1).  To be considered disabled, a claimant must establish that he is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'  42 U.S.C. § 423(d)(1)(A).  Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled.  See 20 C.F.R. § 404.1520(a)(4).")

production quotas; a regular rate of performance throughout the workday; no interaction with the general public; occasional interaction with coworkers and supervisors; and a job that is done alone and not a collaborative effort;"[18]

9. Plaintiff had no past relevant work;

10. Plaintiff was 18 years old, which is defined as a younger individual, on the alleged disability onset date and was 20 years old, which is also defined as a younger individual, on the date last insured;

11. Plaintiff had at least a high school education and was able to communicate in English;

12. Transferability of job skills was not an issue because Plaintiff did not have past relevant work;

13. Prior to attaining the age of 22, and considering Plaintiff's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy that Plaintiff could perform;

14. Through the date last insured, and considering Plaintiff's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy that Plaintiff could perform;

15. Plaintiff was not under a disability at any time prior to November 2, 2013, the date she attained the age of 22; and

16. Plaintiff was not disabled as of the alleged onset date of June 1, 2010 through December 31, 2011, the date last insured.

## IV.    Plaintiff's Allegations of Error

Plaintiff asserts three allegations of error.  First, Plaintiff argues that the ALJ erred by failing to find that she meets the criteria for a finding of presumptive disability pursuant to § 12.06 (anxiety-related disorder) of 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings") and that, alternatively, the ALJ "should have sought the assistance of a medical expert to make a complete determination as to meeting or equaling the listings."[19]  Second, Plaintiff asserts that the ALJ failed to assign the proper weight to the opinion of Plaintiff's treating psychiatrist, Dr. David Greeson.[20]

---

[18] AR p. 26.

[19] R. Doc. 9, pp. 6-7.

[20] R. Doc. 9, p. 10.

Finally, Plaintiff argues that the Commissioner failed to meet its burden at step five of the analysis to prove that Plaintiff was capable of performing other work. With respect to this last assignment of error, Plaintiff specifically argues that the jobs cited by the vocational expert and used as evidence of other work that could be performed by the Plaintiff require "a temperament that is inconsistent" with the ALJ's RFC determination.[21]

## V.    Law and Analysis

### A.  Listing § 12.06

Plaintiff argues that she meets the Listing criteria set forth in § 12.06 to establish presumptive disability. Listing § 12.06 details the criteria for disabling "Anxiety Related Disorders." 20 C.F.R., pt. 404, subpt. P, appx. 1, § 12.06. To meet the requirements of this Listing, a claimant must show that the requirements of A and B are satisfied, or that the requirements of A and C are satisfied:

> A.  Medically documented findings of at least one of the following:
>
> > 1.  Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
> >
> > > a.  Motor tension; or
> > > b.  Autonomic hyperactivity; or
> > > c.  Apprehensive expectation; or
> > > d.  Vigilance and scanning;
> >
> > Or
> >
> > 2.  A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
> >
> > 3.  Recurrent severe panic attacks manifested by a sudden, unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average at least once a week; or

---

[21] R. Doc. 9, p. 12.

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollection of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home.

Plaintiff contends that "there is ample evidence"[22] in the record to support a finding that she meets the requirements of A and B. With respect to the paragraph A requirements, Plaintiff relies on medical records from Dr. Greeson, her treating psychiatrist. With respect to the paragraph B requirements, Plaintiff relies on her own and her grandmother's testimony at the June 16, 2014 hearing. In her decision, the ALJ focused on the paragraph B requirements and found those requirements were not satisfied.[23] The ALJ also held that "the evidence fails to establish the presence of the 'paragraph C' criteria."[24] Plaintiff does not assert that the ALJ's determination regarding paragraph C criteria was in error or that the paragraph C criteria are met in this case.

---

[22] R. Doc. 9, p. 8.

[23] AR p. 26.

[24] AR p. 26.

Because there is substantial evidence to support the ALJ's determination that the paragraph B criteria are not met, it is unnecessary to consider whether Plaintiff has also established the requirements of paragraph A.[25]

### i. Testimony from the June 16, 2014 Hearing

As noted above, a hearing was held before the ALJ on June 16, 2014, during which Plaintiff and her grandmother, with whom she lives, testified.[26]  During the hearing, Plaintiff testified that she saw Christian counselors through her church regularly and continued to see Dr. Greeson every three months.[27]  Plaintiff explained that she took medication for concentration, mood swings, and anxiety.[28]  She explained that when anxious, "if I don't like remove myself from the situation or environment that is making me anxious, then I might proceed to have a panic attack where I hyperventilate and usually start crying, and then that, that sometimes proceeds to me having flashbacks."[29]  She stated that she had panic attacks when going to public places, like the mall or Walmart, and that the last attack was perhaps a week prior to the hearing.[30]  She further explained

---

[25] With respect to Listing § 12.06(A) criteria, the undersigned understands Plaintiff's argument to be that she meets the criteria of either (A)(3) (*i.e.*, recurrent severe panic attacks occurring on average at least once a week) or (A)(5) (*i.e.*, recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress).  While Dr. Greeson's notes include Plaintiff's reports of panic attacks, there is no indication regarding the severity of the reported panic attacks, and, based on Dr. Greeson's notes, Plaintiff has not established that such attacks occur on average at least once a week.  *See, Steele v. Astrue*, CV07-2126-A, 2008 WL 5611803, at * 7 (W.D. La. Sept. 22, 2008) ("The evidence in the administrative transcript does not indicate that Steele's panic attacks are recurrent and severe…").  With respect to Plaintiff's flashbacks, the record is sparse and limited to Plaintiff's self-reporting.  Per the Listing, the § 12.06(A) criteria must be established via "[m]edically documented findings."  With respect to the other paragraph A criteria, Plaintiff's briefing does not attempt to establish that Plaintiff meets the requirements of § 12.06(A)(1), and she has not cited any medically documented findings of motor tension, autonomic hyperactivity, apprehensive expectation, or vigilance and scanning that would be required for that particular subpart.  Similarly, there is no indication in Plaintiff's briefing, and the medical records do not support, that Plaintiff arguably meets the criteria of (A)(2) (*i.e.*, persistent irrational fear of a specific object, activity, or situation) or (A)(4) (*i.e.*, recurrent obsessions or compulsions).

[26] AR pp. 35-61.

[27] AR pp. 42-43.

[28] AR p. 43.

[29] AR p. 43.

[30] AR p. 44.

that if she felt a panic attack coming on, she would walk outside and that it usually took 15-25 minutes to calm down.[31]  She asserted that she gets easily overwhelmed when she tries to work, can be sensitive to noises around her,[32] and that although she had some retail jobs in 2011, she stopped working because she "was having panic attacks and flashbacks…."[33]

Plaintiff stated that she can drive, prepare food for herself, and do some household chores, although her grandmother "usually has to remind me several times."[34]  She stated she does yoga at home and sometimes volunteers at her church.[35]    She noted she could only concentrate on television for 20 to 25 minutes.  She explained that in 2011, there could be 3-4 days in a week that she wouldn't get out of bed,[36] and that at the time of the hearing in 2014, "it's still difficult for me to get up in the morning.  Like I struggle to get up in the morning, but I just push myself to do it."[37]

Plaintiff's grandmother, Evelyn Nichols, testified that Plaintiff came to live with her in 2011 and that at that time, "she wouldn't even let me set up her room like a normal room.  All she wanted to do was have a mattress on the floor and covers that she could pull over her head."[38]  Ms. Nichols noted that while she thought Plaintiff's medications were helping, Plaintiff slept "90 percent of the time."[39]  Ms. Nichols further stated that although Plaintiff had little interest in

---

[31] AR p. 44.

[32] AR p. 46.

[33] AR p. 48.  Plaintiff explained that the flashbacks usually related to sexual or physical abuse that occurred when she was younger, or her friend that committed suicide.

[34] AR p. 44 & 48.

[35] AR p. 45.

[36] AR p. 51.

[37] AR p. 50.

[38] AR p. 54.

[39] AR p. 55.

television, when Plaintiff went to church, "she's good.  She just loves being in church.  And I asked her why that is, and she says she's in God's house and she just feels very safe…."[40]  She explained that Plaintiff is "always verbally trying to help her friends" and that she belongs to a recovery group and that "she loves the young girls in her group, and they'll call her on the phone and talk to her, and she'll try and help them in every way she can."[41]

### ii.  Plaintiff Has Not Established She Satisfies Listing § 12.06

Plaintiff has the burden of establishing that she meets a Listing.  *See*, *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); 20 C.F.R. § 404.1520(d).  The criteria for the Listings are "demanding and stringent."  *Siewert v. Colvin*, Civil Action No. 15-476, 2016 WL 7478968, at * 6 (M.D. La. Dec. 29, 2016) (citing *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994)).  "Plaintiff's subjective complaints, without objective medical evidence, are insufficient to establish disability."  *Id.* (citing 20 C.F.R. §§ 404.1508, 404.1528, 404.1529).  "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

Here, the ALJ found that "[t]he severity of the claimant's mental impairment, considered singly and in combination, did not meet or medically equal the criteria of listing 12.04"[42] and

---

[40] AR p. 55.

[41] AR pp. 55-56.

[42] AR p. 25.  In making her finding, the ALJ found Plaintiff had not met the "paragraph B" or "paragraph C" criteria of § 12.04.  In support of her appeal, Plaintiff argues that she meets Listing § 12.06, which includes the same paragraph B and C criteria.  As set forth herein, Plaintiff does not assert on appeal that she meets the paragraph C criteria of § 12.06 and there is substantial evidence to support the ALJ's finding that Plaintiff's condition does not satisfy the paragraph B criteria.  Because the paragraph B criteria is the same under either Listing, the ALJ did not err by failing to specifically analyze § 12.06.  *Bordelon v. Astrue*, 281 Fed. Appx. 418, 422 (5th Cir. 2008) ("the record reflects that the ALJ specifically evaluated Listing 12.04 for affective disorders and found Bordelon failed to satisfy the requirements necessary to meet or to medically equal its criteria.  Bordelon does not allege that the ALJ improperly considered Listing 12.04.  It therefore follows that Bordelon similarly fails to satisfy Listings 12.06 and 12.08, because

focused on whether Plaintiff met the "paragraph B" criteria.  The ALJ found that Plaintiff had mild restrictions in activities of daily living, explaining that Plaintiff could perform personal hygiene tasks, household chores, and could drive.[43]  With respect to social functioning, the ALJ found Plaintiff had moderate difficulties, noting that Plaintiff alleged she had difficulty being around others and experienced increased anxiety when out in public, but also attends and volunteers at church, and has a friend with whom she socializes.[44]  The ALJ found that Plaintiff had moderate difficulties with respect to concentration, persistence, or pace based on her testimony that she is unable to concentrate for more that 20-25 minutes and because Dr. Van Hook (who performed a consultative examination) noted she had mild memory problems.[45]  Finally, the ALJ found that Plaintiff "had experienced one to two episodes of decompensation, each of extended duration."[46]

Although Plaintiff contends that "[t]he Category 'B' criteria is found throughout claimant's testimony, as well as the testimony of her grandmother,"[47] Plaintiff does not contend which specific paragraph B criteria are met.  Plaintiff testified that she can drive, prepare food for herself, do some household chores and yoga, and that she sometimes volunteers at church, all of which provide substantial evidence supporting the ALJ's determination that Plaintiff has only mild restrictions in the activities of daily living.  There is no evidence that Plaintiff has experienced repeated episodes of decompensation, each of extended duration.  Presumably, Plaintiff's and her

---

each has the same Part B requirements as Listing 12.04.  An ALJ does not err by failing to specifically consider a listing if the record evidence shows that the claimant did not meet the criteria.").

[43] AR p. 25.

[44] AR p. 26.

[45] AR p. 26.

[46] The term "repeated episodes of decompensation, each of extended duration" is defined as "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."  20 C.F.R., pt. 404, subpt. P, appx. 1, § 12.00(C)(4).  The ALJ's determination that Plaintiff experienced one to two episodes of decompensation does not meet this standard.  Moreover, the administrative record does not support a finding that she has experienced repeated episodes of decompensation.

[47] R. Doc. 9, p. 8.

grandmother's testimony is relevant to Plaintiff's ability to maintain social functioning and concentration, persistence, or pace. However, Ms. Nichols' testimony regarding Plaintiff's engagement with her recovery group weighs against a finding that Plaintiff has marked difficulties in social functioning. With respect to Plaintiff's difficulties in maintaining concentration, persistence, or pace, although Medical Source Statement of Ability to Perform Work-Related Activities (Mental) (the "MSS") completed by Dr. Greeson indicated "marked" limitations in Plaintiff's ability to maintain attention and concentration for extended time periods as well as her ability to remember locations and work-like procedures, the MSS also sets forth that Plaintiff either has no limitation or mild or moderate limitations in the majority of the ability areas listed, including the ability to remember and carry out simple and detailed instructions and complete a normal workday and week without interruptions from psychologically based symptoms.[48]    Accordingly, there was substantial evidence to support the ALJ's finding that Plaintiff's condition did not meet paragraph B criteria, and Plaintiff has not carried her burden of proving she can satisfy the requirements of Listing § 12.06.[49]

## B. Weight Accorded to Dr. Greeson's Opinion

Plaintiff also argues that the ALJ erred in giving little weight to the opinion of Plaintiff's treating psychiatrist, Dr. Greeson.

### i. Plaintiff's Medical Records

The administrative record in this case includes records from Greenbrier Behavioral Health

---

[48] AR pp. 386-388.

[49] Plaintiff provides no basis for her alternative assertion that "the ALJ should have sought the assistance of a medical expert to make a complete determination as to meeting or equaling the listings." R. Doc. 9, pp. 6-7. "The decision to consult with a medical expert is within the discretion of the ALJ." *Holmes v. Astrue*, Civil Action No. H-08-2885, 2009 WL 3190466, * 11 (S.D. Tex. Sept. 30, 2009) (citing *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989) ("The ALJ has the discretion to order a consultative examination.")).

("Greenbrier") from December 2, 2009 through December 5, 2009;[50] Jefferson Oaks Behavioral

Health ("Jefferson Oaks") from February 23, 2010 through June 10, 2010;[51] and the Chiron Center

for Wellness ("Chiron") from February 4, 2011 through May 6, 2014.[52] Plaintiff's alleged onset

date is June 1, 2010, her date last insured is December 31, 2011, and she turned 22 on November

2, 2013. Accordingly, records from Greenbrier[53] and certain records from Jefferson Oaks reflect

treatment prior to Plaintiff's alleged onset date. Dr. David Greeson treated Plaintiff at both

Jefferson Oaks and Chiron and, on May 6, 2017, completed a MSS.[54] Because Plaintiff has alleged

the ALJ erred in the weight assigned to Dr. Greeson's opinion, this recommendation includes an

analysis of all of Dr. Greeson's treatment records, including those occurring prior to the alleged

onset date.[55] Additionally, certain records reflect treatment following Plaintiff's date last insured

and the date she turned 22. For purposes of entitlement to disability insurance benefits, treatment

records from Plaintiff's alleged onset date through December 31, 2011 would generally be

relevant. For purposes of entitlement to child's benefits, treatment records from Plaintiff's alleged

onset date through November 2, 2013 would generally be relevant. However, because the ALJ

---

[50] AR pp. 260-269; 402-414.

[51] AR pp. 270-346.

[52] AR pp. 349-373; 390-400.

[53] Plaintiff was admitted to Greenbrier on December 2, 2009 for "excessive use of drugs." AR p. 414. Intake notes reflect that Plaintiff was cognitively intact with an initial diagnostic impression of poly substance abuse with anxiety, depression, and insomnia. AR p. 411-412. A psychiatric evaluation conducted at Greenbrier reflects that she was admitted "after she was found passed out by her Mother, when she tried an inhalant from a bag. She was increasingly depressed recently and having more anxiety problems." AR p. 263. The evaluation further provides that Plaintiff denied "any symptoms of psychosis or mania or anxiety at this time. She admits to having mood swings when she uses drugs. When she does not use drugs, she states that her mood is normal…." AR p. 263. As noted above, Plaintiff's alleged disability onset date is June 1, 2010. The records from Greenbrier reflect treatment prior June 1, 2010; however, these record have been considered for historical context as they reflect similar complaints as those following the alleged disability onset date.

[54] AR pp. 386-388.

[55] In her ruling, the ALJ noted that Plaintiff was seen four times by Dr. Greeson between the date of her discharge from Jefferson Oaks and her date last insured, and that she was seen an additional 13 times prior to attaining the age of 22. AR p. 28. As noted above, the ALJ also considered records post-Plaintiff's 22nd birthday. *See*, AR p. 22.

considered Plaintiff's records reflecting treatment before the alleged onset date and after November 2, 2013, this recommendation likewise includes consideration of those records.

### 1. Jefferson Oaks Records Prior to Alleged Onset Date

A Psychological Assessment was completed at Jefferson Oaks on February 23, 2010, which included a Mental Status Exam.[56]  On exam, Plaintiff's mood was noted as cooperative, depressed, and calm.[57]  Her speech was logical and coherent, and she was oriented to place, time, person, and situation.[58]  She reported generalized anxiety, social anxiety, and panic attacks.[59] Plaintiff was admitted to Jefferson Oaks on February 25, 2010 with a chief complaint of "I guess drugs" and subsequently deemed appropriate for outpatient therapy.[60]  She reported symptoms of anxiety, including panic attacks accompanied by tremors and shortness of breath and social anxiety consisting of excessive worrying, uneasiness, paranoia, being short-tempered, and impulsive.[61] She also reported instances of childhood sexual abuse and that she was experiencing "flashbacks."[62]  A February 25, 2010 Nursing Assessment indicates that Plaintiff was oriented to time, place, and person, that her recent and remote memory were intact, as well as her attention span and judgment.[63]  The Nursing Assessment notes Plaintiff's mood as sad, depressed, and anxious, with social behaviors of "attentive" and "gets along with others" checked.[64]  Dr. Greeson met with Plaintiff on February 25, 2010, and noted on mental status exam that her mood was

---

[56] AR pp. 324-329.

[57] AR p. 326.

[58] AR p. 326.

[59] AR p. 326.

[60] AR p. 345.

[61] AR p. 345.

[62] AR p. 345.

[63] AR p. 334.

[64] AR p. 334.

euthymic, her thought process goal directed, and her insight and judgment were fair.[65]

On March 4, 2010, Dr. Greeson's progress notes indicated that Plaintiff reported "no panic attacks" but was still anxious.[66]  At that time, Dr. Greeson noted Plaintiff's thought process was goal directed and that her insight and judgment were fair.[67]  On March 11, 2010, Plaintiff reported "I've been good" but was still experiencing some social anxiety.[68]  On mental status exam, Dr. Greeson noted Plaintiff's mood as euthymic, her thought process as goal oriented, and her insight and judgment as fair.[69]  Similar findings on mental status exam were made by Dr. Greeson on March 18, 2010,[70] April 1, 2010,[71] and April 8, 2010.[72]  Dr. Greeson's notes from April 29, 2010 show that Plaintiff reported "I'm good," and her mental status exam indicated her mood was euthymic with linear thought process and fair insight and judgment.[73]  On May 13, 2010, Plaintiff reported that the anniversary of her friend's death was upcoming.[74]  On mental status exam, Plaintiff's mood was noted as depressed and anxious, her thought process as goal directed, and her insight and judgment as fair.[75]  Similar mental status exams were recorded by Dr. Greeson on May

---

[65] AR p. 304.

[66] AR p. 300.

[67] AR p. 300.

[68] AR p. 298.

[69] AR p. 298.

[70] AR p. 296 (noting Plaintiff's mood as anxious, her thought process was goal directed and her insight and judgment were fair).

[71] AR p. 294 (mental status exam indicating depressed mood with fair judgment and insight).

[72] AR p. 292 (noting goal directed thought process and fair insight and judgment).  Social worker notes from this date reflect that "Patient had a positive effect and elated mood.  Patient talked about a lot of positive happenings in her life."  AR p. 344.

[73] AR p. 290.  *See also*, AR p. 341 (social worker notes from April 29, 2010 indicating "patient had positive mood and normal affect").

[74] AR p. 288.  Plaintiff reported that in 2009, she and another individual found the body of a friend who had committed suicide.  *See*, AR pp. 278 & 345.

[75] AR p. 288.

27, 2010[76] and June 3, 2010 (*i.e.*, two days after Plaintiff's alleged onset date).[77]

## 2. Treatment Records Following Alleged Onset Date

On June 3, 2010, Plaintiff reported to Dr. Greeson that she was in good spirits.[78]  On June 10, 2010, Plaintiff "graduated" from Jefferson Oaks.[79]  Plaintiff reported that she felt "slightly anxious" and Dr. Greeson noted her mood as anxious and her insight and judgment as fair.[80] Plaintiff's discharge and transition plan noted that Plaintiff had "remained clean and sober throughout treatment" at Jefferson Oaks and included a post discharge plan showing Plaintiff was cleared for part time work and school in the future, and that she would follow up with Dr. Greeson for at least 90 days for medication maintenance.[81]

The next progress note from Dr. Greeson in the administrative record is from February 4, 2011.  On that date, Dr. Greeson noted Plaintiff was "doing fairly well.  No problems or complaints."[82]  On that date, Plaintiff's mood was noted as euthymic, her thought process was goal directed, but her insight and judgment were noted as poor.[83]  On April 6, 2011, Plaintiff complained of loss of focus at work,[84] and on July 1, 2011, Plaintiff reported she was suffering anxiety with

---

[76] AR p. 286 (noting anxious mood, goal directed thought process, fair insight and judgment).

[77] AR p. 284 (noting anxious mood, goal direct thought process, and fair insight).

[78] AR p. 284.

[79] AR p. 282.

[80] AR p. 282.

[81] AR p. 346.

[82] AR p. 400.

[83] AR p. 400.  Dr. Greeson continued to record Plaintiff's insight and judgment as poor on April 6, 2011 (AR p. 399), July 1, 2011 (AR p. 398), August 23, 2011 (AR p. 368), January 13, 2012 (AR p. 367), September 11, 2012 (AR p. 364), October 4, 2012 (AR p. 363), November 1, 2012 (AR p. 360), January 7, 2013 (AR p. 358), April 12, 2013 (AR p. 356), May 21, 2013 (AR p. 355), and June 18, 2013 (AR p. 354).   With the exception of two of these sessions in which Plaintiff's mood was noted as anxious and two sessions in which no mood was noted, Plaintiff's mood was noted as either euphoric or euthymic and her thought process was noted as goal directed.  *See*, AR pp. 358, 364, 398, & 360.

[84] AR p. 399.

panic attacks up to twice a week.[85]  On August 23, 2011, Dr. Gresson noted "Plaintiff doing fairly well…zero problems or complaints."[86]  The August 23, 2011 visit was Plaintiff's last recorded visit with Dr. Greeson prior to December 31, 2011, the date she was last insured for purposes of receiving disability insurance benefits.

On January 13, 2012, Dr. Greeson noted "Patient doing well, zero problems or complaints, seems happy with current regime."[87]  On September 11, 2012, Dr. Greeson noted "Plaintiff doing well but broke up with fiancé…manic episode when she cheated on him.  Wants help now."[88]  On November 28, 2012, Dr. Greeson noted that Plaintiff was in good spirits but was having difficulty sleeping.[89]  Similarly, on January 7, 2013, Plaintiff reported she was having difficulty sleeping and complained of significant anxiety.[90]  On April 12, 2013, Dr. Greeson noted that Plaintiff was "doing well," was "currently stable," and was "volunteering to type sermons for church."[91]  On June 18, 2013, Dr. Greeson noted that Plaintiff "seems to be ok on" her current medications.[92]  On September 16, 2013, Plaintiff reported to Dr. Greeson that she was applying for disability, could not handle having a job, was unable to handle the stress of work, and was unable to attend regularly.[93]  The September 16, 2013 visit was Plaintiff's last recorded visit with Dr. Greeson prior to November 2, 2013, the date she turned 22, for purposes of receiving child's benefits.

---

[85] AR p. 398.

[86] AR p. 368.

[87] AR p. 367.

[88] AR p. 364.

[89] AR p. 359.

[90] AR p. 358.

[91] AR p. 356.

[92] AR p. 354.

[93] AR p. 396.

### 3.  Medical Records Following Plaintiff's 22nd Birthday

On November 11, 2013, Plaintiff reported a manic episode with sexual acting out, and by cover letter of the same day, Dr. Greeson stated "[i]t is my medical opinion that Ms. Nichols symptoms result in impairment in occupational and educational functioning."[94]  Thereafter, on January 6, 2014, Plaintiff reported she was "good," that she had a good holiday, and that she was looking for a part-time job.[95]  Plaintiff further reported that she had been grieving the loss of her mother during her last session with Dr. Greeson and that she was "doing better now" and had "moved to acceptance."[96]  During the January 6, 2014 session, Dr. Greeson noted Plaintiff's mood to be euthymic, her thought process to be goal oriented, and her insight and judgment to be fair.[97]  Similarly, Plaintiff's mood was noted as euthymic and her thought process goal oriented on April 2, 2014, when Dr. Greeson noted Plaintiff was doing fairly well, had no problems or complaints, and was stable on current medication.[98]  On May 6, 2014, Dr. Greeson noted Plaintiff reported "another manic episode."[99]

Dr. Greeson completed a MSS on May 6, 2014.[100]  Therein, Dr. Greeson noted Plaintiff had marked limitations in the following areas: (1) "remember locations and work-like procedures;" and (2) "[t]he ability to maintain attention and concentration for extended periods (the approximate

---

[94] AR pp. 394-395.

[95] AR p. 393.

[96] AR p. 393.

[97] AR p. 393.

[98] AR p. 392.

[99] AR p. 390.

[100] AR pp. 386-387.  The MSS utilizes the following definitions with respect to potential limitations: (1) "none" – "no limitations;" (2) "mild" – "only a minimal limitation; does not significantly affect the individual's ability to function. Accordingly, the individual is capable of usefully and consistently performing the activity;" (3) "moderate" – "more that mild and less than marked.  The individual's capacity to perform the activity is significantly impaired;" and (4) "marked" – "the individual cannot usefully perform or sustain the activity."  AR p. 386.

2-hour segments between arrival and first break, lunch, second break and departure)."[101]
Additionally, Dr. Greeson noted Plaintiff had moderate limitations in the areas of: (1)
"[u]nderstand, remember and carry out detailed instructions;" (2) "[m]ake judgments on simple
work-related decisions;" (3) "[a]ccept instructions and respond appropriately to criticism from
supervisors;" (4) "[r]espond appropriately to changes in a routine work setting;" (5) "[t]he ability
to sustain an ordinary routine without special supervision;" and (6) "[t]he ability to work in
coordination with or proximity to others without being (unduly) distracted by them."[102]  Dr.
Greeson found Plaintiff had no limitations in the areas of: (1) getting along with co-workers or
peers without unduly distracting them or exhibiting extreme behaviors; and (2) maintaining basic
standards of neatness and cleanliness.  Finally, Dr. Greeson found Plaintiff had only mild
limitations in the following areas: (1) "[u]nderstand, remember and carry out simple instructions;"
(2) "[i]nteract appropriately with the public;" (3) "perform activities within a schedule, maintain
regular attendance, and be punctual within customary tolerances;" (4) "complete a normal workday
and workweek without interruptions from psychologically based symptoms and to perform at a
consistent pace without an unreasonable number and length of rest periods;" (5) "be aware of
normal hazards and take appropriate precautions;" (6) "ask simple questions or request assistance;"
and (7) "maintain socially appropriate behavior."[103]  In narrative, Dr. Greeson noted that Plaintiff
had "apparent competence" but struggled with "impulse control" and that she "has periods of
decompensation in which her behavior is more extreme and her reliability is extremely
impaired."[104]  Dr. Greeson concluded that Plaintiff "is disabled and unable to manage the

---

[101] AR pp. 386-387.

[102] AR pp. 386-387.

[103] AR pp. 386-387.

[104] AR p. 388.

challenges of a work environment."[105]

### ii. Substantial Evidence Supports the ALJ's Treatment of Dr. Greeson

The ALJ found that "Dr. Greeson's assessments are not corroborated by his medical records."[106]  In making this determination, the ALJ reviewed Dr. Greeson's progress notes and pointed out that for multiple visits, Plaintiff reported no complaints.  The ALJ explained that while Plaintiff complained of decreased focus at work during her April 6, 2011 visit with Dr. Greeeson, "[n]owhere does it appear that Dr. Greeson advised the claimant to discontinue working."[107]  The ALJ recognized that "[a]t the visit on July 1, 2011, [Plaintiff]…reported panic attacks up to twice weekly.  However, at her office visit on August 23, 2011, after her medications were adjusted, no complaints were recorded."[108]  The ALJ noted that while Plaintiff reported manic episodes to Dr. Greeson, there was no evidence that these episodes were ever seen by Dr. Greeson (*i.e.*, that she was manic when treated) and that "Dr. Greeson did not document the duration of any of these manic episodes in his notes."[109]  Further, the ALJ pointed out that "[o]n January 14, 2014, the claimant advised Dr. Greeson that she was considering part-time work.  Again, nothing was mentioned in his notes to indicate that he advised the claimant against this.  However, it appears this course of action is contrary to his medical source statements."[110]

Generally, the "opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability."  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *see also* 20 C.F.R. §

---

[105] AR p. 388.

[106] AR p. 28.

[107] AR p. 28.

[108] AR p. 28.

[109] AR p. 28.

[110] AR pp. 28-29.

404.1527(c)(1) (examining physician opinion given more weight than non-examining physician).[111]  The *Newton* Court held that before an ALJ declines to give "any weight" to the opinions of the claimant's treating specialist, the ALJ must consider: (1) the physician's length of treatment; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) consistency of the opinion with the record as a whole; and (6) the physician's specialization. 209 F. 3d at 456.  However, an ALJ may reject the treating source's opinion when "'there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another.'"  *Walker v. Barnhart*, 158 Fed. Appx. 534, 535 (5th Cir. 2005) (quoting *Newton*, 209 F.3d at 458).  Further, "the ALJ may give 'less weight, little weight, or even no weight' to the opinion of a treating physician upon a showing of good cause." *Ray v. Barnhart*, 163 Fed. Appx. 308, 313 (5th Cir. 2006) (quoting *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001)).  In summary, an ALJ is free to discredit the opinion of a treating physician when it is contradicted by the evidence in the record.  *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987) (ALJ may reject a treating physician's opinion in favor of an examining physician where the evidence supports a contrary conclusion).

---

[111] For claims filed on or after March 27, 2017, the federal regulations provide:

> We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources. When a medical source provides one or more medical opinions or prior administrative medical findings, we will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section). We will articulate how we considered the medical opinions and prior administrative medical findings in your claim according to paragraph (b) of this section.

20 C.F.R. § 404.1520c.  Because this claim was filed prior to March 27, 2017, the treating physician rule set forth in 20 C.F.R. § 404.1527 controls.

Where an ALJ has found a treating physician's opinion to be inconsistent with that physician's own treatment records and other evidence in the record, this court has affirmed the ALJ's rejection of that opinion. *See*, *Villar v. Colvin*, Civil Action No. 14-562, 2015 WL 7731400 (M.D. La. Oct. 8, 2015) (affirming ALJ's rejection of treating physician's opinion where physician's own notes and other notes in the record failed to support the physician's opinion); *Miller v. Colvin*, Civil Action No. 14-675, 2016 WL 1178391, at * 4 (M.D. La. Feb. 25, 2016) (affirming ALJ's decision to afford little weight to treating psychiatrist's Mental Medical Source Statement where Statement was unsupported by psychiatrist's own treatment notes). Here, the ALJ expressly found Dr. Greeson's opinion as set forth in the MSS contrary to his own treatment notes. Plaintiff argues that the ALJ instead improperly relied on the evaluation of Dr. Van Hook, who "only visited with the claimant for a brief period and never provided treatment."[112] While the ALJ did give "great weight" to Dr. Van Hook's assessment,[113] the ALJ's decision does not discount Dr. Greeson's opinions because they are contrary to Dr. Van Hook's assessment; instead, as discussed herein, the ALJ found that Dr. Greeson's opinions were contrary to his own treatment records. Further, while Plaintiff contends "[t]here is simply no reason to discount Dr. Greeson's

---

[112] R. Doc. 9, p. 10. Dr. Van Hook reviewed Plaintiff's records, including those from Jefferson Oaks and Chiron, and met with Plaintiff on September 24, 2013. AR pp. 379-381. Following an examination of Plaintiff, Dr. Van Hook concluded:

> Her ability to understand, remember and carry out simple instructions was intact during this examination. Her ability to maintain attention/concentration for performance of simple repetitive tasks was adequate but she showed some memory trouble. Her ability to respond appropriately to supervision and interact appropriately with others was adequate. She showed an adequate level of social judgment and understanding of the general principles related to social situations. Her ability to sustain effort and persist at a normal pace over the course of a routine 40-hour workweek is mildly impaired from a psychological perspective by her mood dysregulation and her anxiety. Her ability to show adequate stress tolerance appeared adequate today with medication management.

AR p. 381.

[113] AR p. 28.

evaluation because in the Judge's view, he did not document her condition enough,"[114] that is not the basis for the weight the ALJ assigned to Dr. Greeson's statements. Instead, the ALJ reviewed Dr. Greeson's progress notes and explicitly set forth the basis for her determination that the conclusions in the MSS were inconsistent with Dr. Greeson's records. There is substantial evidence in the administrative record to support the ALJ's determination. Under such circumstances, it is not legal error for the ALJ to assign little weight to the opinion of Plaintiff's treating psychiatrist. *See*, *Parker v. Astrue*, Civil Action No. 11-294, 2012 WL 5384821, at * 7 (M.D. La. Nov. 1, 2012) ("While the plaintiff pointed out several excerpts from the treatment records which he contends support [treating physician's] restrictions [set forth in a mental residual functional capacity assessment], the same records contain other information which supports the ALJ's finding that the limitations imposed by Dr. Parsons were unsupported."); *Swan v. Colvin*, Civil Action No. 15-60, 2016 WL 5429669, at * 13 (M.D. La. Aug. 30, 2016) ("The Court finds it unnecessary to determine whether Dr. Morrison is a 'treating physician' because Dr. Morrison's November 26, 2013 Medical Source Statement is inconsistent with her treatment records and would not be entitled to substantial weight even if Dr. Morrison is a 'treating physician.' The Fifth Circuit has held that an ALJ may give less weight to a treating physician's opinion when good cause is shown, as is the case when his statement as to disability is so brief and conclusory that it lacks strong persuasive weight, is not supported by medically acceptable clinical laboratory diagnostic techniques, *or is otherwise unsupported by the evidence*.") (citing *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)) (emphasis added by *Swan* court).[115]

---

[114] R. Doc. 9, p. 9.

[115] To the extent Plaintiff seeks to rely on the MSS for a determination of the ultimate issue of whether Plaintiff is able to work, "some opinions by physicians are not medical opinions, and as such have no 'special significance' in the ALJ's determination." *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) (quoting 20 C.F.R. § 404.1527(e) & (e)(3)). "Among the opinions by treating doctors that have no special significance are determinations that an applicant

### C. The Commissioner Met Its Burden at Step Five

Finally, Plaintiff argues that in making her determination that there are jobs in significant numbers that Plaintiff could perform, the ALJ relied on several jobs which require temperaments inconsistent with Plaintiff's residual functional capacity. The ALJ set forth Plaintiff's RFC as follows:

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: unskilled work with no strict time limits or production quotas; a regular rate of performance throughout the workday; no interaction with the general public; occasional interaction with coworkers and supervisors; and a job that is done alone and not a collaborative effort.[116]

During the June 16, 2014 hearing, the ALJ presented the above RFC, with the additional explanation that "[t]his person needs a job that has a regular rate of performance as opposed to jobs such as fast-food workers that have peak hours and off hours" to a vocational expert, who then opined that there were certain jobs in the economy that Plaintiff could perform.[117] Specifically, the vocational expert opined that Plaintiff could perform the jobs of "janitor," Dictionary of Occupational Titles ("DOT") number 381.687-018; "janitor or housekeeper," DOT number 323.687-014; and "bookkeeping clerk," DOT 219.587-010.[118] Plaintiff argues that these three jobs require temperaments inconsistent with the RFC requirements of "no strict time limits" or "regular rate of performance." With respect to the occupation of janitor, Plaintiff argues that the DOT requires the temperament to "perform[] repetitive work, or perform[] continuously the same work, according to set procedures, sequence, or pace." With respect to the occupation of

---

is 'disabled' or 'unable to work.' These determinations are legal conclusions that the regulation describes as 'reserved to the Commissioner.'" *Frank*, 326 F.3d at 620 (quoting 20 C.F.R. § 404.1527(e)(1)).

[116] AR p. 26.

[117] AR p. 57.

[118] AR pp. 57-58.

janitor/housekeeper, Plaintiff argues that the DOT requires, in addition to the previous requirement, the ability to "work[] under specific instructions, which precludes independent action or judgment in working out job problems." Finally, with respect to the occupation of bookkeeping clerk, Plaintiff argues that the DOT temperament requirements include adapting to "[s]ituations requiring the precise attainment of set limits, tolerances, or standards" and "[m]aking generalizations, evaluations, or decisions based on sensory or judgmental criteria."[119]

In *Carey v. Apfel*, 230 F.3d 131, 143 (5th Cir. 2000), plaintiff argued that the ALJ's decision was not supported by substantial evidence because the vocational expert's testimony that plaintiff could perform certain identified jobs was in conflict with the DOT description. In particular, the vocational expert had opined that plaintiff could work as a cashier or ticket seller despite having use of only one arm. Plaintiff argued such opinion was inconsistent with the job requirements of handling and fingering for between one-third and two-thirds of the day as set forth in the DOT. *Id*. at 145. In considering plaintiff's argument, the court first analyzed whether any actual conflict between the vocational expert's testimony and the DOT existed. The court found no actual conflict existed, explaining that the DOT "does not contain any requirement of bilateral fingering ability or dexterity, and the vocational expert specifically testified that the jobs of cashier and ticker seller could be performed with the use of only one arm." *Id*. at 146. The court went on to explain:

> [Plaintiff's] counsel was given an opportunity to object or cross-examine the vocational expert on the effect of Carey's amputation on his ability to perform the identified jobs. Nonetheless, [plaintiff's] counsel did not raise the issue or challenge the vocational expert's testimony that the jobs of cashier and ticket seller could be performed with only one arm and hand. [Plaintiff] basically contends that the vocational expert's testimony that he could perform certain jobs requiring manual dexterity in the lowest

---

[119] *See*, R. Doc. 9, pp. 12-13.

> third of the population should have been explored further, when
> [plaintiff] himself failed to do so in the administrative hearing.

*Id.* The court found that given the lack of an actual conflict (as opposed to an implied or indirect conflict),[120] the ALJ was entitled to rely on the vocational expert's testimony. *Id.* Further, the court explained that "claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Id.*

Here, like *Carey*, there does not appear to be an actual conflict between the temperaments cited by Plaintiff above and Plaintiff's RFC. The RFC specifically requires unskilled work with no strict time limits or production quotas, and precludes jobs in which there are peak or rush times. Plaintiff does not explain, and it is not clear on the face of the DOT temperament descriptions that the jobs cited by the vocational expert are inconsistent with this RFC. Moreover, despite Plaintiff's assertion that the June 16, 2014 hearing was "not an adversarial proceeding," the *Carey* court explicitly stated adversarial development of such purported conflicts should occur during the administrative hearing. Here, Plaintiff's counsel asked no questions of the vocational expert.[121] Finally, the ALJ directly requested that the vocational expert advise her of any conflict between the expert's opinion and the DOT.[122] Under such circumstances, it was not legal error for the ALJ to rely on the vocational expert's opinion to find that there were a significant number of jobs that existed in the economy which Plaintiff could perform.

---

[120] As the court explained, "[t]he conflict identified by Carey does not even become apparent until the further inference is made that the jobs require manual dexterity with, not one, but two hands." *Carey*, 230 F.3d at 146.

[121] *See*, AR p. 60.

[122] AR p. 57.

## VI.   Conclusion

The analysis above demonstrates that Plaintiff's claims of reversible error are without merit. The record considered as a whole supports the finding that the ALJ applied the proper legal standards and substantial evidence supports the determination that Plaintiff was not disabled.

## RECOMMENDATION

It is the recommendation of the magistrate judge that under sentence four of 42 U.S.C. § 405(g), the final decision of the Acting Commissioner of Social Security, Carolyn W. Colvin, denying the applications for disability insurance benefits filed by plaintiff Jessica Nichols, be affirmed and this action be dismissed.

Signed in Baton Rouge, Louisiana, on July 11, 2017.


**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**